IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LINDA K. CARNEY | ) | |
| | ) | |
| v. | ) | 3:12-0744 |
| | ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION | ) | |

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 9), to which defendant has responded (Docket Entry No. 10). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 7),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I. Introduction

Plaintiff filed her application for disability insurance benefits on September 12, 2007, initially alleging a disability onset date of March 1, 2001, due to fibromyalgia,

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

chronic fatigue syndrome, lupus, connective tissue disease, Raynaud's syndrome, Epstein-Barr virus, restless leg syndrome, histoplasmosis, periodic limb movement syndrome, moderate degenerative spine disease, and a bulging disc. (Tr. 308, 335) Plaintiff's date last insured for benefits was December 31, 2001. Plaintiff's claim was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her claim by an Administrative Law Judge (ALJ), and amended her alleged onset date to January 7, 1997. (Tr. 369) The ALJ deemed a further medical expert opinion necessary, and so submitted the record to Barbara Felkins, M.D., for responses to interrogatories and an assessment of plaintiff's work-related limitations. (Tr. 1541-48)

The case came to be heard by the ALJ on August 9, 2010, when plaintiff appeared with counsel and gave testimony. (Tr. 83-110) Testimony was also received from Dr. Felkins and from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until September 7, 2010, when he issued a written decision finding plaintiff not disabled. (Tr. 23-34) That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2001.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 7, 1997 through her date last insured of December 31, 2001 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: hypothyroidism; sensory neuropathy; chronic urinary tract infections; fibromyalgia; depression; & personality disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or

2

combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), reduced by all of the following: the ability to perform only occasional postural actions, such as climbing, balancing, stooping, kneeling, crouching, and crawling; & the requirement that she be limited to the performance of unskilled work, where contact with the public is no more than incidental to the work performed.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 8, 1956 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 7, 1997, the alleged onset date, through December 31, 2001, the date last insured (20 CFR 404.1520(g)).

(Tr. 25, 27, 33-34)

On May 15, 2012, the Appeals Council denied plaintiff's request for review of

the ALJ's decision (Tr. 7-9), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from the ALJ's opinion.

The ALJ described plaintiff's hearing testimony as follows:

During the August 2010 hearing, testimony indicated: that Ms. Carney sometimes had difficulty speaking correctly; that she had trouble functioning; that she quit working because she did not feel well and it was getting worse; that doctors kept telling that there was nothing they could do for her; that her daughter, who had the same symptoms as her, died in her sleep in June 2001; that she has difficulty with memory; that she attempted suicide more times than she can count; that she slit her wrist in 2001, but she lived due to a rare blood clotting disorder; that her husband was a dentist and chiropractor and he would sometimes try to adjust her to relieve her back pain; that she stayed in bed a lot; that she was afraid of being around people; that she stayed to herself; that she would not be able to stand for more than 20 minutes without having to sit or recline; that she could lift a gallon of milk, but not repetitively; that her ex-husband used to do the grocery shopping because she could not walk enough; that she could walk very little; that her antidepressant medications caused her side effects, such as excessive sleeping; that she has difficulty coping with the death of her daughter.

(Tr. 27-28)

The ALJ summarized the record of plaintiff's physical impairments as follows:

Although initially thought to have a significant hearing loss, specific testing by a hearing specialist, John Shea, M.D., and found to have 100% hearing discrimination in June of 1997 (Exhibit lF).

In August and October of 1997, Ms. Carney had complaints of alternating constipation & diarrhea, which were thought to be possible results of either irritable bowel syndrome, or her anxiety, or some combination of the two (Exhibit 17F).

Records from the Endocrine Clinic indicate that during late 1997 and early 1998, Ms. Carney's hypothyroidism was somewhat difficult to control. However, she was noted to frequently self-

4

diagnose and adjust her own medication level, despite a prescribed regimen from her endocrinologist, Elisa Hofmann, M.D. (Exhibit 6F)

Although Ms. Carney had complaints of symptoms (such as recurrent urinary and vaginal infections, and pain in her lower back and joints of the lower extremities) which could possibly be indicative of various syndromes, or a connective tissue disease, extensive testing requested by the rheumatologist, Cathy Chapman, M.D., indicated normal results. The doctor's physical examination of Ms. Carney also indicated normal findings, including a good range of motion and a normal gait, with only mild diffuse tender points in September of 1999 (Exhibits 2F- 4F). Similar physical findings were documented by David George, M.D., in November of 1999 (Exhibit 7F). Abdominal imaging was also reported to be normal and internist, George Chu, M.D., found no urological basis for her complaints (Exhibit *SF*). The addition of a headache and dizziness, to her other symptoms of flank pain, were the basis of an evaluation in the emergency room of Methodist Hospital on January 24, 2000. Again, no focal neurological problems were found and all tests were noted to be normal (Exhibits 8F & 56F). After reviewing the records from several physicians, covering the time period from mid-1997 through his own examination of Ms. Carney in April 2000, Dr. W. Zack Taylor was of the opinion that she may possibly have fibromyalgia, but that her noted symptoms, as well as her constipation were likely the result of the use of pain medications and non-steroidal anti-inflammatory medications (Exhibits lOF & llF). She also presented herself to the Baptist Memorial Hospital in mid-April, with complaints of right flank pain, following a recent bladder infection. Imaging studies indicated a large amount of fecal matter in the right colon (Exhibits 23F & 24F).

In May of 2000, Ms. Carney was examined by Maroun Dick, M.D., for complaints of memory difficulties and incoordination. She indicated that her symptoms were ongoing for a year, but that
her memory was improving and she indicated that she is normally "sharp." She also complained of lifelong "staring spells." These complaints were in addition to her complaints of low back pain, as well as pain and numbness in her fingers. During their visits, Ms. Carney was alert and well oriented and her memory was intact. Physically, she had strength rated at 5/5 throughout, with reflexes in the low-normal range. Imaging of her brain and an EEG were both normal. Neuropsychological testing indicated that her memory difficulty was stress related and not the result of a neurologic disease (Exhibits 68F & 77F).

In October of 2000, Ms. Carney was seen by yet another rheumatologist, Hugh T. Holt, M.D. After listening to Ms. Carney's symptoms and history, physical examination again noted no neurologic deficits, good range of motion, no active fibromyalgia or tender points, motor strength rated at 5/5 throughout, good pulses, and generally normal findings in all extremities, Dr. Holt indicated his opinion that there was nothing suggestive of inflammatory arthropathy or connective tissue disease. He was unable to provide a specific diagnosis for her multiple complaints and periodic arthralgias and did not anticipate following-up with Ms. Carney in the future (Exhibits 12F & 13F).

In December of 2000, Ms. Carney was seen by Michael Sorensen, M.D., for complaints of spinal

pain and left leg discomfort. Physical examination was generally normal, with some mild limitation of spinal motion due to pain. Neurontin was prescribed, as was a course of physical therapy. However, Ms. Carney failed to return to the physical therapy after the second visit and was discharged (Exhibits 57F & 58F).

Despite complaints of pain and numbness in her back, left arm, & left leg, EMG nerve conduction tests performed in November 2000 and again in January 2001, indicated generally normal findings in all areas tested, other than a "mild" sensory neuropathy. Yet, her physical examination, conducted by Feiyu Chen, M.D., again indicated normal reflexes, 5/5 motor strength throughout, normal muscle tone with no atrophy, a good range of motion, and a steady gait (Exhibit 14F).

Dr. Gregory Hanissian, M.D., who saw Ms. Carney in early 2001, diagnosed her with fibromyalgia, but indicated, in a letter to the District Attorney, that a majority of her chronic pain is a response to stress and that she should be relieved from any court appearances at the time. Yet, the bulk of Ms. Carney's lab results were negative, or normal, and that she was generally healthy, with only some tender points noted in March of 2001. She was responding well to the use of the steroid, Prednisone (Exhibits 73F & 76F).

On September 28, 2001, Ms. Carney was seen at the Memphis Medical Center by HWM, M.D. (whose signature is illegible). Ms. Carney informed the doctor that she was previously diagnosed with lupus, but she refused to let him request any of her prior medical records and all of her tests came back normal. Because of this, the doctor refused to treat Ms. Carney further and recommended that she see another physician (Exhibit 17F, Page 3).

At the end of October 2001, Ms. Carney was seen at the division of rheumatology in the University of Tennessee Medical Group. Again, she had normal coordination, no loss of range of motion, and no prominence of tender points. Michael Cremer, M.D., indicated there were no compelling signs of connective tissue disease. He made no changes in her medications, other than to decrease her Prednisone/steroid (Exhibits 18F & 19F).

By October & November of 2002 (10 months after Ms. Carney's date last insured for benefits), in addition to her previous symptoms, Ms. Carney reported increasing symptoms of chronic fatigue, drawing of her hands, muscle spasms, and waking up at night feeling paralyzed. She was seen at the Northeast Arkansas Medical Clinic and was informed by Beata Majewski, M.D. that her workup for Lupus was again negative. Her physical examination again indicated a full range of motion, with no edema in her extremities. Imaging of her brain was normal, as was an EEG study (Exhibits 20F- 22F).

(Tr. 28-30)

The ALJ summarized the record of plaintiff's mental impairments as follows:

Ms. Carney was briefly hospitalized in the Methodist Psychiatric Hospital from January 7 to 13, 1997, for treatment of her depression and anxiety, after taking a handful of Xanax. Her condition was thought to stem somewhat from concern over her physical health symptoms. However, the greater contributor to her psychiatric condition appeared to be her marital difficulties and relationship with her husband. After participating in group and individual therapies, and after adjustment of her medication regimen, Ms. Carney was stabilized and discharged with a global assessment of functioning (GAF) score of 80 (Exhibits 47F, 61F- 63F, & 67F). A GAF rating from 71-80 indicates "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)" *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.*

Ms. Carney was again hospitalized, this time under an emergency commitment order, from March 27, 1997 through April 1, 1997, at the Greenleaf Psychiatric Hospital. Her difficulty again stemmed from a possible attempted suicide arising from relationship problems with her husband. She was treated for depression counseling and a medication regimen and was again discharged after it was determined that she was not a danger to herself, or others. At the time of her discharge, she was assessed a GAF rating of 67 (Exhibits 48F- 55F & 70F). A GAF rating from 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships)" *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.*

Other than these two hospitalizations, there is very little evidence of mental impairment prior to Ms. Carney's December 31, 2001 date last insured. The vast majority of her medical records indicate an individual that is alert and oriented, with no psychological difficulties other than some occasional memory problems, which were related to stress issues. She regularly followed her prescribed medication regimens related to her depression and anxiety (Exhibits 64F- 66F). There are no indications that any limitations were placed on her functional abilities, by any of her treating physicians during the time prior to her date last insured.

Via written interrogatories, the undersigned sought the opinion of the medical expert, psychiatrist, Barbara Felkins, M.D., who reviewed the evidence of record and provided her written assessment regarding Ms. Carney's psychological abilities and limitations. In doing so, Dr. Felkins considered Ms. Carney's entire history, well past her date last insured. It was Dr. Felkins' expert opinion that Ms. Carney would have marked limitations in her ability to understand, remember and carry out complex instructions; marked limitations in her ability to make judgments on complex work related decisions [( Dr. Felkins indicated that although Ms. Carney would have the stated limitations regarding "complex" instructions, she should be able to handle "detailed" instructions ok.)]; and moderate limitations in the ability to interact appropriately with co-workers, supervisors and the general public; where "marked" means there is serious limitation in an area, with substantial loss in the ability to effectively function; & where "moderate" means there is more than a slight limitation in an area but the individual is still able to function satisfactorily (Exhibit 71F). Dr. Felkins reaffirmed her

7

assessment during her August 9, 2010 hearing testimony.

[O]ne of Ms. Carney's more recent treating physicians, Conn McConnell, M.D., provided his written opinion [in 2010] indicating that Ms. Carney is "permanently totally disabled" and unable to hold any employment (Exhibit 74F). . . .

Similarly, another of her physicians, Francis Fenaughty, M.D., indicated in a letter dated April 8, 2010, that he was of the opinion that when he treated Ms. Carney on a single visit to the Methodist Germantown Hospital emergency department on January 24, 2000, she was unable to work, other than intermittently at her husband's dental practice (Exhibit 78F). However, the medical evidence indicates that Ms. Carney was in the emergency room for less than 3 hours on that date. Her testing was all negative, or normal and she was discharged with the indication that she had been treated for syncope related to a temporary drop in her blood pressure (Exhibits 8F & 56F).

(Tr. 30-32)

Unmentioned by the ALJ is the letter written by Dr. Larry S. Felts, M.D., on September 15, 2008, in which Dr. Felts states that he "recently did a psychiatric evaluation and extensive review of medical records on Linda Carney," and opines as follows:

> She meets the criteria for having a Somatization Disorder, Generalized Anxiety Disorder, and Major Depression Disorder. These problems have been going on a long time as evidenced by her suicide attempt by overdose in 1996, and having her brother file petition to have her committed in 1997. She has been prescribed 10 different antidepressants, 4 different anti-anxiety medicines, stimulants, anti-psychotics, mood stabilizers, pain medicines, and muscle relaxers.
>
> On her current mental status exam she has significant impairment of concentration and memory. She has had some paranoid delusions as well as auditory hallucinations.
>
> Over all I believe that Linda Carney has serious physical and psychiatric problems that impair her ability to work. These problems began over 10 years ago and are expected to continue for the foreseeable future.

(Tr. 1044-45)

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found

to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

10

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in failing to find that her somatoform disorder, generalized anxiety disorder, and chronic fatigue syndrome were severe impairments at the second step of the sequential evaluation process. However, the severity analysis at step two, while a *de minimis* hurdle for disability claimants to clear, is not the ALJ's last chance to demonstrate consideration of the impairment or symptoms alleged to be severe. So long as the ALJ evidences his consideration of such impairments at subsequent steps of the process, any error in failing to classify the impairments as severe is harmless. See, e.g., Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987). Consistent with this principle, plaintiff herself notes that, "regardless of whether the ALJ considered [her] Somatoform Disorder, General Anxiety Disorder, and CFS to be severe or nonsevere, he was required to consider [their] effects, both singularly and in combination, on her residual functional capacity[.]" (Docket Entry No. 9-1 at 20)

In this case, the record does not appear to support the existence of somatoform disorder as a medically determinable impairment capable of being found to be severe. Rather, the evidence cited by plaintiff appears to at best support the existence of a somatic

component to her complaints to her various physicians. Plaintiff's argues, based on the opinion letter from Dr. Francis Fenaughty, that her symptoms could best be explained by a diagnosis of mixed connective tissue disease or somatoform disorder, and that since mixed connective tissue disease had been ruled out, the "alternative diagnosis of somatoform should stand." (Docket Entry No. 9-1 at 17) However, this argument is without merit, as it merely presents plaintiff's counsel's deductive reasoning, without any evidentiary basis for finding somatoform disorder to be a severe, medically determinable impairment.[2]

With respect to plaintiff's anxiety disorder, the ALJ clearly considered its impact on her functional abilities in analyzing the applicability of Listing 12.06 (Tr. 25-26) and in assigning great weight to the assessment of Dr. Felkins, who identified plaintiff's anxiety and personality disorders as severe and opined that plaintiff had significant work-related mental limitations as a consequence. Thus, any error in the ALJ's failure to include anxiety disorder in his step two finding is harmless.

Regarding plaintiff's chronic fatigue syndrome, although the ALJ did not account for that diagnosis *per se*, he found plaintiff's severe impairments to include fibromyalgia despite questionable support for that diagnosis in the medical record, and clearly considered the fatigue plaintiff suffered from as related in notes from treatment of her hypothyroidism, depression, and other conditions. Moreover, the ALJ noted that plaintiff's chronic fatigue symptoms were reported as increasing in October and November of

---

[2]Dr. Fenaughty's opinion letter is clearly susceptible to a skeptical view, as it relates the physician's opinion on April 8, 2010, as to plaintiff's condition over ten years earlier, when she was seen by Dr. Fenaughty on January 24, 2000, in the emergency room. (Tr. 1629) This emergency room visit was plaintiff's only interaction with Dr. Fenaughty.

12

2002, ten months after plaintiff's date last insured for benefits. (Tr. 30) Accordingly, the ALJ did not commit reversible error in failing to recognize chronic fatigue syndrome among plaintiff's severe impairments.

Plaintiff next argues that the ALJ erred in relying on vocational expert (VE) testimony which was based on an incomplete hypothetical. Specifically, plaintiff contends that the ALJ's hypothetical did not include his finding, on page four of his decision (Tr. 26), of marked difficulties with regard to concentration, persistence and pace. However, on page five of his decision (Tr. 27), the ALJ explains that his earlier findings pertaining to plaintiff's mental functioning were solely directed to the analysis of impairment severity at steps two and three of the sequential evaluation process, vis-à-vis the Listing of Impairments and their "paragraph B" functional criteria, and were not appropriately imported directly into the subsequent analysis of plaintiff's residual functional capacity (RFC) at steps four and five of the process. Rather, the ALJ explicitly noted that his finding of plaintiff's RFC -- including "the requirement that she be limited to the performance of unskilled work, where contact with the public is no more than incidental to the work performed" -- reflects the degree of limitation that was noted in his analysis of the "paragraph B" criteria of the listed mental impairments. This approach is directed by agency regulations and rulings. See SSR 96-8p, 1996 WL 374184, at *4; 20 C.F.R. § 404.1520a. Accordingly, the ALJ did not err in failing to incorporate his finding of marked difficulties upon application of the psychiatric review technique, 20 C.F.R. § 1520a, into the hypothetical question to the VE. Rather, he appropriately applied the medical evidence he credited -- principally, the assessment of Dr. Felkins -- to determine plaintiff's RFC and to construct his hypothetical question to the VE. Nor is the result in this case undermined by the fact that the VE's testimony was elicited

prior to, and without the benefit of, plaintiff's hearing testimony, since the RFC finding was ultimately based on the record medical evidence and did not include limitations based solely on credited testimony of the plaintiff.

Plaintiff next argues that the ALJ's decision is subject to remand because it relied on the hearing testimony of Dr. Felkins, and significant portions of that testimony were not transcribed due to being inaudible. Plaintiff cites the Second Circuit's decision in Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996), as support for the requested reversal on the basis of this inaudible testimony. However, in Pratts, the hearing recording was accidentally turned off for a large portion of the medical expert's testimony, whereas here, the inaudible portions of the hearing transcript are not so significant as to wholly deprive the reader of the substance of Dr. Felkins' opinion. Moreover, the medical expert in Pratts -- whose conclusions comprised the only medical expert assessment in the record, and so were adopted in large measure by the ALJ -- only gave his opinion from the witness stand. Here, the ALJ explicitly relied upon Dr. Felkins' written assessment (Tr. 1546-48) appended to her responses to the ALJ's written interrogatories (Tr. 1541-45), and noted in his decision that "Dr. Felkins reaffirmed her assessment during her August 9, 2010 hearing testimony." (Tr. 31) Accordingly, the undersigned finds no reason to remand this decision based on the inaudible portions of Dr. Felkins' testimony.

Plaintiff next takes issue with the ALJ's failure to reference his consideration of the opinion letter from Dr. Larry S. Felts, who stated in that 2008 letter that he "recently did a psychiatric evaluation and extensive review of medical records" on plaintiff, and opined that "[s]he meets the criteria for having a Somatization Disorder, Generalized Anxiety

14

Disorder, and Major Depression Disorder," and that "[o]n her current mental status exam she has significant impairment of concentration and memory . . . [and] has had some paranoid delusions as well as auditory hallucinations." (Tr. 1044-45) Dr. Felts' letter concludes with the statement that "[o]verall I believe that Linda Carney has serious physical and psychiatric problems that impair her ability to work. These problems began over 10 years ago and are expected to continue for the foreseeable future." (Tr. 1045) Plaintiff's main point of contention with regard to this letter is that it was due explicit attention in the ALJ's decision, if not significant weight, based on Dr. Felts' status as an examining psychiatrist, especially given the ALJ's reliance upon the opinion of nonexamining psychiatrist Dr. Felkins. However, Dr. Felts does not purport to have examined plaintiff during her insured period, but rather seven years later. In fact, there is no report of examination results in the record at all, but only the brief letter making reference to a recent psychiatric evaluation. Other than this bare reference to said evaluation and to plaintiff's "current mental status exam," Dr. Felts' letter consists of a summary history of plaintiff's medical complaints, diagnoses, and treatment, as well as the conclusions quoted above. Even overlooking that the examination occurred far outside the relevant period, without any contemporaneous record of the examination and its results, it could fairly be argued that Dr. Felts does not deserve to be considered an examining source. In any event, Dr. Felkins made specific reference to Dr. Felts' letter and disputed his conclusions (Tr. 1542), a stance that can reasonably be attributed to the ALJ pursuant to his adoption of Dr. Felkins' opinion. Finally, to the extent that Dr. Felts' opinion speaks to a current problem that began during or before the insured period, it appears that it would fall into the category of evidence that "has little relevance to her condition during the pertinent period under consideration." (Tr. 31)

Plaintiff further points to the opinion of treating physician Dr. Hanissian as having received erroneous treatment. However, the ALJ explained that, aside from his diagnosis of plaintiff's fibromyalgia, Dr. Hanissian's records largely reveal normal test results and clinical findings to go along with noted success of her treatment with Prednisone. (Tr. 29) As to the opinion offered by Dr. Hanissian in a February 2001 letter to excuse her appearance in court, that opinion speaks to plaintiff's need to avoid stressful situations which were felt to trigger her chronic fatigue and pain symptoms, "for a period of 3 months." (Tr. 1594) This opinion, then, does not account for any enduring limitations of the sort required to establish disability.

Finally, plaintiff alleges error in the ALJ's decision to discount the credibility of her subjective complaints. However, in finding that the objective medical record sufficiently establishes the existence of conditions capable of causing pain and fatigue, but that the record does not support the disabling severity of those conditions or their symptoms, the ALJ properly applied the prevailing legal standard for evaluating subjective complaints. See Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001); 20 C.F.R. § 404.1529(c). His reasoning is plainly apparent in his review of the relevant medical record, as it centers on the vast inconsistency between plaintiff's reports of symptoms to her various doctors, and their largely normal findings on physical examination, film studies, and laboratory testing. Her presentation engendered skepticism in some physicians while confounding others (e.g., Tr. 523, 597, 633), and she was noted to be well appearing in numerous treatment notes, while admitting that her symptoms were prone to remission and responsive to treatment with medication. Her physical ability to continue riding horses during the period at issue was a clear detriment to the credibility of her complaints of debilitating pain and fatigue. (Tr. 30)

Ultimately, there appears to have been an evidentiary shortfall in this case, as the ALJ noted in describing the weight of medical evidence which postdated plaintiff's insured period and which demonstrates a worsening of her conditions,[3] compared with relatively little evidence generated during the relevant period which support the degree of limitation alleged. (Tr. 30, 31) Substantial evidence supports the ALJ's credibility finding in this case.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

---

[3] Plaintiff was apparently found disabled during some portion of the subsequent period, as the Appeals Council made reference to such finding and favorable ruling on an application filed on September 10, 2010. (Tr. 8)

**ENTERED** this 4th day of December, 2014.

              s/ John S. Bryant
              JOHN S. BRYANT
              UNITED STATES MAGISTRATE JUDGE